ORIGINAL

Approved: _____
SAMSON ENZER / MARGARET GRAHAM
Assistant United States Attorneys



Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

SARAH NETBURN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -

SURESH HIRANANDANEY,
     a/k/a "Sam Hiranandaney,"
LALIT CHABRIA,
ANITA CHABRIA,
SAMIR HIRANANDANEY, and
SEEMA SHAH,
              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**SEALED COMPLAINT**

Violation of
18 U.S.C. §§ 371 & 1349

DOC #

COUNTY OF OFFENSE:
NEW YORK

U.S. DISTRICT COURT
FILED

MAY 27 2014

S. D. OF N.Y.

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JOSEPH C. GRIMALDI, being duly sworn, deposes and says that he is a Special Agent with United States Department of Homeland Security, and charges as follows:

### COUNT ONE
(Student Visa Fraud Conspiracy)

          1.   From at least in or about September 2011, up to and including in or about May 2014, in the Southern District of New York and elsewhere, SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SEEMA SHAH, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, violations of Title 18, United States Code, Section 1546(a).

          2.   It was a part and object of the conspiracy that SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SEEMA SHAH, the defendants, and others known and unknown, willfully and knowingly would and did make under oath, and as permitted under penalty of perjury under Section 1746 of

Title 28 of the United States Code, knowingly did subscribe as true, false statements with respect to material facts in applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder, and knowingly did present such applications, affidavits, and other documents which contained such false statements and which failed to contain a reasonable basis in law or fact, in violation of Title 18, United States Code, Section 1546(a).

OVERT ACTS

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about September 7, 2011, the Micropower Career Institute ("MCI"), a privately owned for-profit school with Manhattan and other campuses, submitted a Form I-17 to the United States Department of Homeland Security, Student and Exchange Visitor Program ("SEVP") petitioning for a continuation of approval to admit foreign citizens as students on F-1 student visas.

b.    On or about September 7, 2011, MCI appointed SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendant, as the Primary Designated School Official ("PDSO"), and LALIT CHABRIA and ANITA CHABRIA, the defendants, as Designated School Officials ("DSOs"), responsible for ensuring MCI's compliance with federal regulations relating to F-1 visas.

c.    On or about September 7, 2011, SURESH HIRANANDANEY, LALIT CHABRIA, and ANITA CHABRIA, the defendants, each signed the Form I-17 described above under a certification representing that he or she had read the federal regulations relating to F-1 student visas and intended to comply with those regulations at all times.

d.    During a surprise SEVP site visit to MCI's Manhattan campus on or about September 27, 2011, LALIT CHABRIA, the defendant, and another DSO at MCI represented to an SEVP official that for an F-1 visa student to be engaged in a full course of study at MCI, as required to maintain an active F-1 visa, the F-1 student must participate in 18 clock or credit hours a week per four-month term, and was required to attend at least 80 percent of the classes given in a course.

2

e.     Approximately a few days after the surprise site visit, LALIT CHABRIA, the defendant, emailed an internal MCI spreadsheet to SEEMA SHAH, the defendant, and other MCI employees indicating that about 644 of the 729 F-1 students enrolled at MCI's Manhattan campus (*i.e.*, about 88 percent of the F-1 students) had delinquent attendance below the 80 percent attendance level required by MCI.

f.     In response to the surprise SEVP site visit, senior MCI officials, including SURESH HIRANANDANEY, LALIT CHABRIA and ANITA CHABRIA, the defendants, decided to offer F-1 students with delinquent attendance records (but good tuition payment histories) the option of transferring to affiliated schools (*i.e.*, other MCI campuses or a school run by the same officials) that were not under SEVP scrutiny.

g.     In or about October 2011, MCI international student advisors — including SEEMA SHAH, the defendant — contacted numerous tuition-paying F-1 visa students with delinquent attendance and offered them this transfer option.

h.     In or about October 2011, MCI used an internet-based system maintained by SEVP to electronically transfer a number of tuition-paying F-1 students with delinquent attendance to affiliated schools that were not under SEVP scrutiny.

i.     Prior to executing the transfers of these F-1 visa students, neither MCI's PDSO (SURESH HIRANANDANEY, the defendant) nor any of the school's DSOs (such as LALIT CHABRIA and ANITA CHABRIA, the defendants) reported to SEVP that the active F-1 status of these students should have been terminated.

(Title 18, United States Code, Section 371.)

### COUNT TWO
(Wire Fraud Conspiracy)

4.     From at least in or about September 2011, up to and including in or about May 2014, in the Southern District of New York and elsewhere, SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SEEMA SHAH, the defendants, and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States of

3

America, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

5.    It was a part and an object of the conspiracy that SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SEEMA SHAH, the defendants, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate commerce writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## OVERT ACTS

6.    In furtherance of the conspiracy and to effect the illegal object thereof, SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SEEMA SHAH, the defendants, and others known and unknown, committed the same overt acts set forth above in Count One of this Complaint, among others, in the Southern District of New York and elsewhere.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
(Student Financial Aid Fraud Conspiracy)

7.    From at least in or about June 2011, up through and including in or about May 2014, in the Southern District of New York and elsewhere, SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SAMIR HIRANANDANEY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, violations of Title 20, United States Code, Section 1097(a).

8.    It was a part and an object of the conspiracy that SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SAMIR HIRANANDANEY, the defendants, and others known and unknown, willfully and knowingly, would and did embezzle, misapply, steal, obtain by fraud, false statement, and forgery, and fail to refund funds, assets, and property provided and insured under Subchapter IV of Chapter 28 of Title 20, United States Code, and Part C of Subchapter I of Chapter 34 of Title 42,

4

United States Code, in an amount exceeding $200, in violation of Title 20, United States Code, Section 1097(a).

9.      In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.      In or about August 2011, SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, and ANITA CHABRIA, the defendants, caused employees of MCI to fabricate, falsify, manipulate, alter, and forge records contained in student financial aid files to prevent the United States Department of Education from discovering MCI's failure to comply with federal regulations governing the receipt of financial aid.

b.      In or about August 2011, SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendant participated in discussions with others at MCI's Manhattan campus concerning the fabrication, falsification, manipulation, alteration, and forgery of records contained in student financial aid files in anticipation of a Department of Education program review of MCI's compliance with federal financial aid regulations.

c.      In or about August 2011, LALIT CHABRIA, the defendant, supervised MCI employees' fabrication, falsification, manipulation, alteration, and forgery of records contained in student financial aid files at MCI's Manhattan campus.

d.      In or about August 2011, SAMIR HIRANANDANEY, the defendant, fabricated, falsified, manipulated, altered, and forged records contained in student financial aid files at MCI's Manhattan campus.

e.      On or about March 12, 2014, ANITA CHABRIA instructed an MCI employee to forge students' signatures on records contained in student financial aid files.

(Title 18, United States Code, Section 371.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

10.     I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and I am currently assigned to the Document and Benefit Fraud Task Force in New York.  I have been personally involved in the

5

investigation of this case, along with law enforcement agents from the United States Department of State ("DOS") and the United States Department of Education ("ED"). I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my review of pertinent documents and recorded conversations, as well as from my conversations with fellow agents and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of the investigation. Where the contents of documents and the actions, statements and conversations of others are related herein, they are reported in substance and in part, except where otherwise indicated.

### Relevant Entities and Individuals

11.  I have reviewed public records and ED records concerning the Micropower Career Institute ("MCI"). From doing so, I have learned that MCI is a privately owned for-profit school with five campuses at the following locations:   (a) at 137 West 25th Street in Manhattan, New York; (b) 85 Willis Avenue in Mineola, New York; (c) 120 Commerce Drive in Hauppauge, New York; (d) 75-26 Broadway in Queens, New York; and (e) 570 Broad Street in Newark, New Jersey. I recently reviewed MCI's website, which indicated that MCI offers courses in English as a second language, cosmetology, and computerized business accounting, among other topics.

12.  I have reviewed public records and ED records concerning the Institute for Health Education ("IHE"). From this review, I have learned that IHE is a privately owned for-profit school with a campus located at 600 Pavonia Avenue in Jersey City, New Jersey.  I recently reviewed IHE's website, which indicated that IHE offers courses in English as a second language, dental assisting, medical billing and coding, and medical assisting, among other topics.

13.  I have reviewed public records about SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendant. From doing so, I have learned that HIRANANDANEY is the President of MCI.

14.  I have reviewed public records about LALIT CHABRIA, the defendant, who is the brother-in-law of SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendant. From doing so, I have learned that LALIT CHABRIA is a Vice President of MCI and the President of IHE.

6

15.    I have reviewed public records about ANITA CHABRIA, the defendant, who is the wife of LALIT CHABRIA and the sister of SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendants. From doing so, I have learned that ANITA CHABRIA is a Vice President of MCI, and the Director of MCI's Mineola campus.

16.    I have reviewed public records concerning SAMIR HIRANANDANEY, the defendant, who is the son of SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendant.   From this review, I have learned that SAMIR HIRANANDANEY is the Director of MCI's Hauppauge campus.

17.    I have spoken with employees of MCI about SEEMA SHAH, the defendant.   From doing so, I have learned that SEEMA SHAH was an international student advisor at MCI's Manhattan campus, and is now the head of the international student department at MCI's Manhattan campus.   The international student department at MCI recruits, enrolls, and serves F-1 visa students.

### Overview of the Student Visa Fraud Scheme

18.    Based on the facts set forth below, I respectfully submit that there is probable cause to believe that SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, and SEEMA SHAH, the defendants, and others, have enabled numerous foreign citizens to remain in the United States under F-1 student visas based on the fraudulent pretense that these aliens were participating in full courses of study at MCI or IHE. As detailed below, these school officials repeatedly failed to report to United States immigration authorities that foreign citizens were not attending enough classes to maintain their F-1 student visas.

### The F-1 Student Visa Program

19.    From my training and experience as a Special Agent with HSI, and from speaking with an official at the Student and Exchange Visitor Program within the Department of Homeland Security, I have learned about the requirements that foreign citizens must comply with under United States immigration law, including the following:

a.    The United States requires individuals from most foreign countries to obtain visas prior to entry into the United States.   Immigrant visas are required for foreign citizens who intend to immigrate to the United States.   Nonimmigrant visas

7

are required for foreign citizens who intend to enter the United
States on a temporary basis, such as for tourism, medical
treatment, business, temporary work, or study.

        b.    A foreign citizen who wishes to enter or remain
in the United States to pursue a course of study at an academic
institution or for English language training must first obtain
an F-1 nonimmigrant visa, also known as a student visa ("F-1
visa").

        c.    An F-1 visa is only valid for a temporary period
called the "duration of status," which is as long as the foreign
citizen is pursuing a full course of study at an approved school.
According to 8 C.F.R. § 214.2(f)(6), a full course of study for
a foreign citizen studying a language or other nonvocational
training program under an F-1 visa (an "F-1 student") requires
eighteen clock hours of attendance a week (if the dominant part
of the course consists of classroom instruction).  When a
foreign citizen stops pursuing a full course of study, the
duration of status on his F-1 visa ends and the temporary period
for which he was admitted to the United States expires.

        d.    A school seeking approval to admit foreign
citizens as F-1 students must submit a Form I-17 to the
Department of Homeland Security's Student and Exchange Visitor
Program ("SEVP") in Washington, D.C.  The Form I-17 is initially
submitted electronically, through the Student and Exchange
Visitor Information System ("SEVIS"), an internet-based computer
system that the United States Government uses to maintain
accurate and current information on non-immigrant F-1 students.
The school's Form I-17 must establish (among other things) that
the school is a bona fide school.  The school's Form I-17 must
also name up to ten employees of the school appointed to serve
as Designated School Officials ("DSOs"), one of whom must be
appointed the Primary Designated School Official ("PDSO").  Each
DSO and the PDSO must sign the Form I-17 to certify his or her
knowledge of and intent to comply with the regulations relating
to the requirements for admission and maintenance of status of
nonimmigrant students.

        e.    To obtain an F-1 visa, a foreign citizen must
first apply for admission to a school in the United States that
has been certified by SEVP to enroll and train foreign students.
If the foreign citizen is accepted, the school must create an
electronic SEVIS record for the foreign citizen by filling out
an online version of an initial Form I-20, a hard copy of which

is then printed and issued to the foreign citizen.[1]  This "initial I-20" certifies that the foreign citizen has been accepted for enrollment in a full course of study, and is signed by a DSO.  The school activates the student's SEVIS record and prints an "active I-20" after the student arrives and begins making normal progress toward a full course of study, which requires (among other things) live classroom attendance.

### Duties of DSOs

20.  From my training and experience as a Special Agent with HSI, and from speaking with an SEVP official, I have learned about the duties of DSOs at SEVP-certified schools, including the following:

a.  Once a school's Form I-17 for approval to admit foreign citizens as F-1 students is accepted, SEVP officials issue each individual authorized to act as a DSO or PDSO a unique username for accessing the SEVIS system, and the DSO or PDSO must establish a password.  When the DSOs and PDSO are designated by a school in the Form I-17, and again when they are granted access to SEVIS, they are required to certify their knowledge of and intent to comply with the regulations governing the student visa program.

b.  Whenever an SEVP-certified school issues a Form I-20 to enroll a foreign citizen as an F-1 student, a DSO or the PDSO of the school must sign the Form I-20 to certify under penalty of perjury that the foreign citizen will be required to pursue a "full course of study" as defined by the federal regulations in 8 C.F.R. § 214.2(f)(6).

---

[1] If the foreign citizen is already present in the United States at the time he obtains the Form I-20, he must file a change of status application to change (or extend) his status to nonimmigrant F-1 student status.  If, on the other hand, the foreign citizen is outside the United States at the time he obtains the Form I-20, he must present the Form I-20 to a United States Embassy or Consulate and apply for a nonimmigrant F-1 student visa.  The foreign citizen then presents the F-1 student visa and the Form I-20 to United States Customs and Border Protection when entering the United States.  Once the foreign citizen receives the F-1 visa from the United States Department of State, the foreign citizen may enter the United States up to thirty days before the start of classes.

c.   According to 8 C.F.R. § 214.3(g)(2)(ii) and guidance thereunder, DSOs and PDSOs are obligated to report in SEVIS within 21 days the failure of any foreign citizen enrolled on an F-1 visa to maintain active status — including, for example, an unauthorized drop in attendance below the level required for a full course of study.  In making this report, the DSO or PDSO must also terminate the foreign citizen's student record in SEVIS.  All terminated records are flagged for review by the Department of Homeland Security, which determines whether the termination was appropriate.  If so, the foreign citizen is required to apply for reinstatement (if eligible), or depart the United States.

d.   If a foreign citizen on an F-1 visa to attend a SEVP-certified school has not pursued a full course of study at the school, DSOs and PDSOs are prohibited from transferring the foreign citizen to another school.  According to 8 C.F.R. § 214.2(8)(i):  "An F-1 student who was not pursuing a full course of study at the school he or she was last authorized to attend is ineligible for school transfer and must apply for reinstatement . . . , or, in the alternative, may depart the country and return as an initial entry in a new F-1 nonimmigrant status."[2]

## The Student Visa Fraud Scheme

### Representations to SEVP

21.   I have reviewed SEVP records relating to MCI.  From SEVP records, I know that on or about September 7, 2011, MCI submitted a Form I-17 to SEVP petitioning for a continuation of approval to admit foreign citizens as students on F-1 student visas (the "MCI Form I-17").

---

[2] Once an SEVP-certified school terminates an F-1 student's active status in SEVIS for "Unauthorized Drop Below Full Course of Study," thereby flagging the F-1 student's termination for review by the Department of Homeland Security, SEVP guidance allows the school to then transfer the F-1 student's SEVIS records *in terminated status* to another school.  The terminated F-1 student must then file an application for reinstatement of active status with the support of the school the student is transferring to, or depart the United States.  Under 8 C.F.R. § 214.2(8)(i), an F-1 student who has not been pursuing a full course of study at an SEVP-certified school cannot be transferred to another school unless and until his active status is terminated in SEVIS.

22.   The MCI Form I-17 represented that: (a) MCI is a privately-owned school with campuses in New York and New Jersey, offering English language and other programs; (b) the average annual number of students at the school was 300; and (c) the approximate annual total cost of tuition, room, board and related expenses per student was $10,000.00.

23.   The MCI Form I-17 listed SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," the defendant, as MCI's PDSO.  The MCI Form I-17 reflects that SURESH HIRANANDANEY signed the form under a certification providing in pertinent part that he had "read the Immigration and Naturalization Service's regulations relating to nonimmigrant students . . ., and intend[ed] to comply with these regulations at all times."  The MCI Form I-17 also reflects that SURESH HIRANANDANEY signed the form under a certification providing in pertinent part that he "will be responsible for providing the resources and training necessary for [the DSOs listed in the MCI Form I-17] to implement properly the above referenced regulations."

24.   The MCI Form I-17 listed LALIT CHABRIA, the defendant, as one of MCI's DSOs.  The MCI Form I-17 reflects that LALIT CHABRIA signed the form under a certification providing in pertinent part that he had "read the Immigration and Naturalization Service's regulations relating to nonimmigrant students . . ., and intend[ed] to comply with these regulations at all times."

25.   The MCI Form I-17 also listed ANITA CHABRIA, the defendant, as one of MCI's DSOs.  The MCI Form I-17 reflects that ANITA CHABRIA signed the form under a certification providing in pertinent part that she had "read the Immigration and Naturalization Service's regulations relating to nonimmigrant students . . ., and intend[ed] to comply with these regulations at all times."

The September 2011 SEVP Site Visit

26.   From reviewing SEVP records, I know that on or about September 27, 2011, SEVP officials made a surprise site visit at MCI's Manhattan campus (which was then located at 243 West 30th Street), and interviewed LALIT CHABRIA, the defendant, and another DSO of MCI during the site visit.  From speaking with one of these SEVP officials, and from reviewing notes of the interview, I know that LALIT CHABRIA and the other DSO represented during the interview, in substance and in part, that:

11

a. F-1 nonimmigrant students are issued Forms I-20 to participate in English language training at MCI.

b. To be engaged in a full course of study at MCI, an F-1 student must participate in 18 clock or credit hours a week per 4-month term, and must attend at least 80 percent of the classes given in a course.

c. Classroom instructors at the school monitor attendance through a roll call at the beginning of each class, and the results of the roll call are provided to the school administration each day.

d. If an F-1 student is not attending classes regularly and has not been authorized to drop below a full course of study, the school will (on a case-by-case basis) terminate the student's F-1 status in SEVIS after the student has been warned by telephone and by letter.

Efforts to Conceal the Student Visa Fraud Scheme
Following the September 2011 SEVP Site Visit

27. In the course of the investigation in this matter, I and other law enforcement agents have interviewed an individual who was employed at one of the schools under investigation ("Employee-1").[3] Employee-1 has informed me, in substance and in part, of the following:

a. As of September 2011, there were over 700 F-1 visa students enrolled at MCI's Manhattan campus. The school's Manhattan campus, however, only had enough classroom space (with no desks in the classrooms) to fit about 275 students.

b. The majority of F-1 students at the Manhattan campus fell below the 80 percent attendance level required to meet the school's attendance requirements.

---

[3] Employee-1 is expected to plead guilty pursuant to a cooperation agreement with the Government to conspiring to commit immigration fraud and conspiring to commit student financial aid fraud. Employee-1 is cooperating with the Government in the hopes of obtaining a reduced sentence. The information provided to law enforcement by Employee-1 has proven reliable and has been corroborated by other independent evidence, including recordings of conversations with several of the senior MCI officials charged herein.

c.      Lack of attendance among F-1 students was a widespread problem that was: (i) discussed numerous times with senior MCI officials, including SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, and ANITA CHABRIA, the defendants; (ii) discussed numerous times with MCI's international student advisors responsible for recruiting F-1 students, including SEEMA SHAH, the defendant; (iii) widely discussed among employees at MCI; and (iv) obvious from the fact that classrooms were frequently empty, from persistent complaints by classroom instructors that few if any F-1 students attended class, and from other circumstances.

d.      Senior MCI officials, including the PDSO (SURESH HIRANANDANEY) and DSOs (such as LALIT CHABRIA and ANITA CHABRIA), had ready access to attendance data showing that the majority of F-1 students at the Manhattan campus were not meeting the school's 80 percent attendance requirement. Classroom instructors at the school monitored attendance through roll calls at the beginning of each class, and the results of the roll calls were marked by hand onto hard copy attendance sheets that were provided to the school administration each day, and also entered into an electronic database known as "I See All" (the "I See All Database"). Attendance data on the I See All Database could be accessed by most employees at the school. MCI also had a registrar who used the attendance data from the I See All Database to create monthly reports summarizing the average attendance of F-1 students. These monthly attendance reports were widely available to MCI employees.

e.      Senior MCI officials, including the PDSO (SURESH HIRANANDANEY), and DSOs (such as LALIT CHABRIA and ANITA CHABRIA) routinely declined to terminate in SEVIS the active F-1 status of foreign citizens with delinquent attendance, as long as these students paid the school's tuition bills.

f.      In response to the September 2011 site visit to MCI's Manhattan campus by SEVP officials, senior MCI officials — including SURESH HIRANANDANEY and LALIT CHABRIA and ANITA CHABRIA — decided to offer F-1 students with delinquent attendance records (but good tuition payment histories) the option of transferring to affiliated schools (i.e., other MCI campuses or IHE) that were not under SEVP scrutiny. Based on this decision, LALIT CHABRIA disseminated a list of F-1 students with delinquent attendance to certain MCI employees, and had MCI international student advisors — including SEEMA SHAH — contact the F-1 students on this list about this transfer

13

option.

g.    As a result, a substantial number of tuition-paying F-1 students with delinquent attendance were transferred from MCI's Manhattan campus to other MCI campuses or to IHE.

h.    MCI management did, however, terminate in SEVIS the active F-1 status of a number of foreign citizens with delinquent attendance who were not paying their tuition.

28.    In the course of the investigation in this matter, I and other law enforcement agents have interviewed an individual who is currently employed by one of the schools under investigation ("Employee-2").[4]    I have also reviewed internal MCI documents provided by Employee-2.    Employee-2 has informed me, in substance and in part, of the following:

a.    Employee-2 has provided me with an internal MCI spreadsheet (the "Spreadsheet") from late September 2011 indicating that about 644 of the 729 F-1 students enrolled at MCI's Manhattan campus (i.e., about 88 percent of the F-1 students) had delinquent attendance below the 80 percent attendance level required by MCI.    The Spreadsheet shows that as of late September 2011, about 430 of these 729 students (i.e., more than half of the F-1 students) attended less than 50 percent of classes in each course throughout the academic year.

b.    In late September 2011, a few days after the SEVP site visit at MCI's Manhattan campus, LALIT CHABRIA, the defendant, circulated the Spreadsheet to certain MCI employees by way of an internal MCI email provided to me by Employee-2. One of the employees copied on the email was SEEMA SHAH, the defendant.

c.    In early October 2011, SEEMA SHAH, the defendant, sent an email, with the subject line "International Students with Low Attendance," to other MCI employees.    The email has

---

[4] Employee-2 has pleaded guilty pursuant to a cooperation agreement with the Government to one count of conspiring to make false statements to a federal agency, two counts of conspiring to commit immigration fraud, and eight substantive counts of immigration fraud.    Employee-2 is cooperating with the Government in the hopes of obtaining a reduced sentence.    The information provided to law enforcement by Employee-2 has proven reliable and has been corroborated by other independent evidence, including internal MCI documents such as those described herein.

14

been provided to me by Employee-2.   SEEMA SHAH enclosed a list
of students with poor attendance in the email, and stated that a
senior MCI official had informed SEEMA SHAH that any student
with less than 25 percent attendance had to be transferred.
SEEMA SHAH proposed that these students be transferred to either
MCI's Mineola campus or to IHE.

          d.   In October 2011, one of MCI's DSOs circulated an
email within MCI enclosing a list of over 142 F-1 students with
delinquent attendance, including a number of F-1 students who
had indicated a willingness to transfer to MCI's Mineola campus
or to IHE.   Employee-2 has provided a copy of this email to me.
In the email, the DSO told a subordinate at MCI to transfer such
F-1 students to one of those affiliated schools.   MCI officials
— including two DSOs, LALIT CHABIA and ANITA CHABRIA, the
defendants — were copied on the email, along with other MCI
employees.

    29.   Based on my review of the SEVIS system, I have learned
that:

          a.   More than 80 F-1 students were, in fact,
transferred from MCI's Manhattan campus to MCI's Mineola campus
or to IHE in or about October 2011.

          b.   MCI executed these transfers electronically using
the internet-based SEVIS system.

          c.   Before MCI executed the transfers of those F-1
students in SEVIS, neither the PDSO (SURESH HIRANANDANEY, a/k/a
"Sam Hiranandaney," the defendant), nor any of the DSOs
(including LALIT CHABRIA or ANITA CHABRIA, the defendants) at
MCI reported in SEVIS that the active F-1 status of those F-1
students should be terminated.

## Overview of the Student Financial Aid Fraud Scheme

    30.   Based on the facts set forth below, I respectfully
submit that there is probable cause to believe that SURESH
HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, ANITA
CHABRIA, and SAMIR HIRANANDANEY, the defendants, have been
involved in the fabrication and manipulation of documents in
student financial aid files at MCI to keep ED from stopping the
flow of federal financial aid money to those schools.

15

## Federal Financial Aid

31.    From speaking with an ED case agent on this
investigation (the "ED Case Agent"), who is familiar with federal
financial aid programs for domestic students, and from reviewing
ED guidance on such programs, I have learned the following about
a federal financial aid program for domestic students known as
the Pell Grant program:

a.    The Pell Grant program, administered and funded
by ED, provides financial aid to eligible low income post-high
school ("post-secondary") students to assist such students in
meeting the costs of a post-secondary education.   Pell Grants
are outright grants that need not be repaid by the student
recipients.    The grants are paid by ED to the educational
institution in which the student is enrolled and then credited
to the student by the institution to cover institutional charges
such as tuition.   The maximum Pell Grant for any one student was
$5,350 for the 2009-2010 academic year, and has been $5,550 for
the 2010-2011, 2011-2012, and 2012-2013 academic years.

b.    In order to participate in the Pell Grant program,
educational institutions must be accredited or approved by an
appropriate agency and offer a program leading to an academic or
professional degree, vocational certificate, or other recognized
educational credential.   Such programs must also be authorized
and licensed by the state in which the program is offered and be
accredited by a nationally-recognized accrediting body.

c.    No institution can participate in the Pell Grant
program unless it enters into a Program Participation Agreement
with ED.   Eligible programs must be authorized and licensed by
the state in which the program is offered and be accredited by a
nationally recognized accrediting body.   The Program
Participation Agreement conditions the initial and continued
participation of that institution in the Pell Grant program upon
compliance with all applicable laws and regulations.   ED program
regulations specify eligibility requirements, application,
disbursement and refund procedures that institutions must follow
with respect to Pell Grants.

d.    Generally, in order for a student to be eligible
under the Pell Grant program, federal regulations require that
the student must be enrolled in an eligible program at an
eligible post-secondary institution as an undergraduate student.
A student applies for a Pell Grant by submitting a Free
Application for Federal Student Aid ("FAFSA").   ED then

16

generates an Institutional Student Information Record to the educational institution, which in turn determines, based on an ED formula, the amount of the Pell Grant to which the student is entitled.

e.     Once the amount of the student's Pell Grant is determined, the educational institution may apply for disbursement of funds from ED, which is done electronically by computer transmission.  The educational institution is entitled to draw down the funds in two stages within an academic year. For clock-hour schools, the disbursement of Pell Grants is based on the number of hours completed by a student in an eligible program.

f.     Pell Grant funds are disbursed to a student's school on the assumption that the student will attend school for the entire period for which the assistance is awarded.  When a student withdraws, the student may no longer be eligible for the full amount of Pell Grant funds that was originally disbursed. If a Pell Grant recipient withdraws from a school after beginning attendance at a school, the school must determine the amount of the grant earned by the student up to the date of the student's withdrawal.  If the amount disbursed to the school was greater than the amount that the student earned, the school must return unearned funds to ED within 45 days of the date of the student's withdrawal.

g.     Clock-hour schools receiving Pell Grant disbursements must document satisfactory academic progress. Satisfactory academic progress primarily consists of the tracking of student attendance, ensuring that students obtain passing grades, and complete enough classes, for the student's pursuit of successfully completing a degree or certificate program.  Clock-hour schools must also ensure that the student is enrolled in an eligible program, and have a procedure in place for routinely monitoring attendance records, to allow them to determine in a timely manner when a student withdraws.  If a student has been absent for 14 consecutive days, the school should determine by the last day of this 14-day period whether the student intends to return to classes or withdraw.

h.     A student who does not attend classes for 14 consecutive days has withdrawn from the school for Pell Grant purposes unless the student is on an approved leave of absence. Therefore, for a student who has ceased attendance, the institution must either place the student on an approved leave

17

of absence (provided that the conditions for an approved leave
of absence are met), or withdraw the student.

## Receipt of Pell Grant Funding by MCI

32. From speaking with the ED Case Agent, and from
reviewing ED records, I have learned the following:

a. MCI has been approved by ED to receive Pell Grant
funds for domestic students enrolled in several courses,
including 900-clock hour courses in computer networking, dental
assisting, medical assisting, and computerized business
accounting. MCI is currently receiving Pell Grant funds under a
Program Participation Agreement with ED that was executed in
July 2010. The agreement reflects that SURESH HIRANANDANEY,
a/k/a "Sam Hiranandaney," the defendant, signed the agreement as
the President of MCI and agreed on behalf of MCI to comply with
all applicable statutes and regulations relating to the Pell
Grant program.

b. Since 2008, over $13 million in Pell Grant and
other federal financial aid funds have been disbursed to MCI.

## The Student Financial Aid Fraud Scheme

### Fraud relating to the August 2011 ED Program Review

33. I have reviewed a recent preliminary report by ED
concerning the results of a program review ED conducted of MCI in
August 2011 (the "Preliminary Program Review Report"). From
doing so, I have learned that:

a. From on or about August 22, 2011 through on or
about August 26, 2011, ED conducted a program review of MCI to
determine whether MCI was complying with federal laws and
regulations governing the administration of Pell Grants and
other federal aid programs.

b. During the program review, ED examined a sample
of approximately 40 individual student financial aid and
academic files and attendance records, among other materials,
from the 2009-2010 and 2010-2011 financial aid award years.

34. According to Employee-1, senior MCI officials directed
Employee-1 and others to manipulate and fabricate records in
student financial aid files in preparation for the August 2011

program review by ED.   Employee-1 has informed me, in substance
and in part, of the following:

        a.    In or about late July 2011, MCI received advance
notice that ED officials were going to conduct a program review
in late August 2011.

        b.    In anticipation of the program review, LALIT
CHABRIA, the defendant, assigned a group of employees, including
Employee-1, to review hundreds of student financial aid files
for the 2009-2010 and 2010-2011 financial aid award years.
LALIT CHABRIA directed the reviewers to "fix" deficiencies in
the files, in many cases by altering or fabricating records.

        c.    Senior MCI officials, including SURESH
HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT CHABRIA, and SAMIR
HIRANANDANEY, the defendants, were involved in the "fixing" of
those files.

        d.    The files were "fixed" in a number of ways, to
address a variety of deficiencies.  For example, in a
substantial number of cases, MCI had received Pell Grant funds
for students who had effectively withdrawn from school by not
attending classes for 14 consecutive days or more, but MCI had
failed to return the unearned portion of those Pell Grant funds
to ED.  To "fix" student financial aid files with this
deficiency, MCI reviewers created fake leave of absence forms
for a number of student financial aid files to make it appear
that the students had not withdrawn from MCI.  MCI reviewers
also falsified student attendance records by changing attendance
from "absent" to "present," to falsely represent that students
had not been absent for 14 consecutive days.  MCI employees also
falsified documents stating that entrance and exit counseling
had been given to students regarding their federal student
loans, and that MCI employees had verified that a student was
making satisfactory academic progress before MCI withdrew
further federal student loan money for that student, as required
by federal regulations.

        e.    SURESH HIRANANDANEY made a number of visits to a
conference room at MCI's Manhattan campus where MCI reviewers
were "fixing" student financial aid files, and complained that
if his subordinates had properly managed the school's financial
aid program, there would not have been a need to "fix" the
files.

19

f.    LALIT CHABRIA supervised the "fixing" of the files on a day-to-day basis at the Manhattan campus.  Reviewers brought deficient student financial aid files to him, and he instructed them on how to fabricate or alter documents in the files.

g.    SAMIR HIRANANDANEY personally "fixed" student financial aid files at MCI's Hauppauge campus, and when he was done "fixing" files there, he helped to "fix" files at the Manhattan campus.

h.    In or about March 2014, ANITA CHABRIA, the defendant, acknowledged in a discussion that student financial aid files from MCI's Mineola campus were also fixed by MCI employees in 2011.

Fraud relating to the Current ED Inquiry

35.    From speaking with the ED Case Agent, I have learned that ED recently issued the Preliminary Program Review Report to MCI describing ED's preliminary findings from its August 2011 program review of MCI.  From reviewing ED records, including the Preliminary Program Review Report, I have learned that:

a.    The Preliminary Program Review Report identified more than ten areas where MCI's financial aid administration did not comply with federal statutes and regulations.

b.    ED has instructed MCI to review the report, and respond to each finding, indicating MCI's position regarding that finding and the corrective actions taken by MCI to resolve that finding.  ED has also directed MCI to produce documents and information in response to a series of data requests set out in the report.

c.    One of the preliminary findings in the report is that MCI did not accurately verify the student financial information used to award Pell Grant funding.  ED has directed MCI to review the student financial aid files of all Pell Grant recipients who were selected for verification in the 2009-2010 and 2010-2011 financial aid award years, and obtain all missing or incomplete documentation and perform all analyses needed to confirm the relevant students' eligibility.

d.    MCI's response to the preliminary findings in the report is due to be submitted to ED in late May 2014.

20

36.   According to Employee-1, senior MCI officials —
including SURESH HIRANANDANEY, a/k/a "Sam Hiranandaney," LALIT
CHABRIA, and ANITA CHABRIA, the defendants — recently had a
series of discussions with Employee-1 and others about "fixing"
records in student financial aid files in preparation for MCI's
response to ED's Preliminary Program Review Report.   From
speaking with Employee-1 about such discussions, I have learned
the following, in substance and in part, about such discussions:

a.   On or about March 5, 2014, senior MCI officials
— including SURESH HIRANANDANEY and LALIT CHABRIA, the
defendants — participated in a meeting at MCI's Manhattan
campus regarding the review of student financial aid files in
response to ED's Preliminary Program Review Report on MCI.
SURESH HIRANANDANEY acknowledged that student financial aid
files had previously been "fixed" at MCI's Manhattan, Mineola,
and Hauppauge campuses in anticipation of the August 2011
program review by ED.   The Director of MCI's Manhattan campus
then joined the meeting, and was asked by SURESH HIRANANDANEY
what would be done if there were deficiencies with any of the
student financial aid files being reviewed for MCI's response to
the Preliminary Program Review Report.   The Director responded
that he would be doing "repair" work on the student files.

b.   On or about March 12, 2014, Employee-1 asked
ANITA CHABRIA, the defendant, for guidance on fabricating
students' signatures on verification forms per instructions
given by LALIT CHABRIA, the defendant.   ANITA CHABRIA told
Employee-1, in substance and in part, that if Employee-1 had
trouble forging a student's signature, Employee-1 should
photocopy a document with the student's actual signature on it,
cut out the signature and tape it onto a verification form, and
then photocopy the verification form and put the photocopy in
the student's financial aid file.

WHEREFORE, deponent respectfully requests that
warrants be issued for the arrests of SURESH HIRANANDANEY, a/k/a
"Sam Hiranandaney," LALIT CHABRIA, ANITA CHABRIA, SAMIR
HIRANANDANEY, and SEEMA SHAH, the defendants, and that each of
them be arrested and imprisoned, or bailed, as the case may be.


_____
JOSEPH C. GRIMALDI
Special Agent
United States Department of
Homeland Security
Homeland Security Investigations


Sworn to before me this
27th day of May, 2014


_____
HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

SARAH NETBURN
United States Magistrate Judge
Southern District of New York

22